FILED

2005 Jun-30  PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| DIANE TILLERY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 03-JEO-3029-E |
| | ) |
| NHB INDUSTRIES, INC. d/b/a | ) |
| MASTERBRAND CABINETS, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

In this action, plaintiff Diane Tillery ("Tillery" or "the plaintiff"), a former employee of defendant Masterbrand Cabinets ("MBCI" or "the defendant"), asserts various claims against the defendant, including that the defendant (1) violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. by paying her less than similarly situated males; and (2) terminated her because she complained about being paid less than similarly situated males, also in violation of Title VII.  (Doc. 1).[1]  Presently before the court is the defendant's motion for summary judgment (doc. 17) and the plaintiff's motion to strike portions of the affidavit of Michael Schmitt (doc. 21).  Upon due consideration, the motion for summary judgment is due to be granted and the motion to strike is due to be granted in part and denied in part.

## BACKGROUND

NHB Industries, Inc. ("NHB"), manufactures kitchen and bathroom cabinetry at a plant located in Talladega County in Talladega, Alabama.  (Schmitt Aff. at ¶ 3).[2]  In October 1999,

---

[1]References herein to "Doc. ___" are to the docket numbers assigned a particular pleading by the Clerk of the Court and the attached exhibit.  The document numbers are found in the lower right-hand corner of the pleading.

[2]Schmitt's affidavit is located at document 19, exhibit 3 in the court's record of the case.

MBCI acquired NHB.  (Schmitt Aff at ¶ 3).  While MBCI is the parent company, NHB continues to exist and do business as an entity separate and distinct from MBCI.  (*Id.*).  NHB does not maintain its own corporate Human Resources Department.  Instead, NHB contracts with MBCI for corporate human resources support.  (Schmitt Aff. at ¶ 4).  As a result, the Human Resources Manager at each of NHB's plants has a dual reporting requirement - - the HR manager reports both to the on-site NHB General Manager as well as to MBCI's corporate HR department.  (*Id.*).

In August 2001, NHB hired Tillery as a Human Resources Assistant, which was a clerical position that reported to the Human Resources Manager, Henry Polek ("Polek"). (Tillery Dep. at p. 17;[3] Schmitt Dep. at p. 16).[4]  As an HR assistant, Tillery earned $12.00 per hour plus overtime, which resulted in an annual income of approximately $25,000.00.  As a non-exempt employee, she was not eligible for bonuses.  (Tillery Dep. at p. 17).

About six weeks after Tillery became HR assistant, NHB terminated Polek's employment because it was concerned about the direction the HR Department was heading under his supervision.  Specifically, Polek was failing to lead by example, follow company rules and procedures, and be the employees' advocate.  (Schmitt Dep. at pp. 17-18).

When NHB terminated Polek's employment, it did not have anyone who had prior general human resources knowledge who could manage the human resources functions. (Schmitt Dep. at p.23; Schmitt Aff. at ¶ 6).  Fred Crenshaw, the General Manager at the Talladega plant, recommended to Mike Schmitt, MBCI's Vice President of Field Human Resources, that NHB offer Tillery the position of Interim Human Resources Manager while the

---

[3]Tillery's deposition is located at document 19, exhibit 1 in the court's record of the case.

[4]Schmitt's deposition is located at document 19, exhibit 2 in the court's record of the case.

company conducted a search for Polek's replacement. (Schmitt Dep. at pp. 5, 23-25). Schmitt and Crenshaw offered Tillery the position of Interim Human Resources Manager, which she accepted. (Tillery Dep. at pp. 17-18; Schmitt Dep. at pp. 23-24). Although NHB typically gives a promoted employee a 10% pay increase, when Tillery became Interim HR Manager, NHB increased her salary to $34,500.00. (Tillery Dep. at p. 18; Schmitt Dep. at p. 68).

Schmitt was concerned that Tillery did not have the skills, ability and prior general experience to be an effective Human Resources Manager. (Schmitt Dep. at pp. 23-24). However, Crenshaw advised Schmitt that Tillery appeared to be doing the job and he recommended that the Company give her the chance at being the full-time Human Resources Manager. (Schmitt Dep. at pp. 23-24). Thereafter, in late October or early November 2001, NHB promoted Tillery to Human Resources Manager. (Tillery Dep. at p. 19). In connection with the promotion, NHB increased Tillery's annual salary nearly 20 percent to $40,000. (Tillery Dep. at p. 19; Schmitt Dep. at p. 69). With the promotion, Tillery also became eligible for an annual bonus of up to 10 percent of her salary depending on NHB's performance. (Tillery Dep. at pp. 19-20).

The day after Tillery was offered the position, she asked Crenshaw when she would get another increase in pay and how her salary ranked with the other HR managers in the company. (Tillery Dep. at p. 58). Crenshaw responded that she would be reviewed annually and that he did not know how her salary compared to other HR managers. (Tillery Dep. at pp. 59-60).

In 2001, Tillery received a prorated bonus of about $750.00 and a bonus of $3,000.00 or $4,000.00 in 2002. (Tillery Dep. at pp. 20-21). Tillery subsequently received a salary increase of $1,600.00 in late April or early May 2002, bringing her annual base salary to $41,600.00.

(Tillery Dep. at pp. 21-22).

Schmitt testified that Tillery initially appeared do be doing an acceptable job as Human Resources Manager, but that as time went on, he continued to have concerns about her ability to perform as Human Resources Manager and to improve the overall operation and performance of the department.  Specifically, Schmitt testified that:

> Frankly, as time went on and Diane [Tillery] stayed in her position I had some concerns about her ability to perform the job and take the HR function to the level it needed to be down there.  Initially . . . she appeared to be doing an okay job. As time went on we started to see some discrepancies, some concerns, and both Mr. Flowers, from a safety standpoint, and I got together and started . . . raising some concerns about her ability to perform that job . . .
>
> And in December of 2002 we had a conversation with Fred [Crenshaw] about her performance, raised some concerns we had . . . Fred was still not convinced that termination was warranted . . . At hat point in time basically Mr. Flowers and I said look, we got some serious concerns about her ability to do the job down there.  We think it's time to talk about other action rather than a written warning.
>
> We then learned about some concerns and they're identified in her termination letter . . .
>
> And then the other thing that came up from Mr. Crenshaw was the fact that integrity was a concern for him at this point in time because it was his understanding that Diane had a degree and that he had a problem with that when he found out she didn't.

(Schmitt Dep. at pp. 31-33; Schmitt Dep. at Ex. 2).  Schmitt also testified that the company began receiving complaints regarding Tillery's performance through calls directly to the corporate office through the employee hotline, although Schmitt cannot remember how many calls the company received about her.  (Schmitt Dep. at p. 38).  Specifically, the company received complaints from employees who felt they could not talk to Tillery and from other employees who reported that Tillery had "screamed and hollered at them" and did not treat them

with dignity and respect. (Schmitt Dep. at pp.32-34, 38; Schmitt Dep. at Ex. 2).[5]

Schmitt and Ron Flowers ("Flowers"), MBCI's Vice President - Safety, Environmental & Risk Management, had discussions with Crenshaw about Tillery's ability to competently perform as Human Resources Manager in December 2002 and again in early January 2003. (Schmitt Dep. at pp. 20-21; 31-34). Crenshaw did not believe that termination of Tillery's employment was warranted and instead suggested that she be placed on a final written warning to allow her the opportunity to correct some of the issues about which the Company was concerned. (Schmitt Dep. at pp. 32-33, 94-95).

Subsequently, NHB received information that Tillery had gone onto the production floor wearing open-toed shoes, which constituted a violation of NHB's safety protocol, and caused Schmitt concern because the Company expected the Human Resources Manager to lead by example in terms of appropriate dress and use of safety measures in the workplace. (*Id.*). Tillery testified, however, that on one occasion prior to the established safety rules, she went into the plant in shoes that were not safety shoes but she only went into the aisles and not onto the production floor. (Tillery Dep. at pp. 118-137). When the company also became concerned with Tillery's integrity, Flowers conducted an investigation. The investigation focused upon Tillery's educational background and a potential conflict of interest. (*Id.*)

Sometime between January 2002 and June 2002, Tillery provided Crenshaw with an updated version of her resume. (Tillery Dep. at pp. 44-45; Tillery Dep. at Ex. 3). In the section entitled "Education," Tillery's resume indicated: "Jacksonville State University - B.S., Business

---

[5]Tillery asserts that she was never reprimanded following any of the hotline calls. Schmitt insists, although he cannot remember specifics, that either he or Ron Flowers follows up all hotline calls with the appropriate HR manager. (Schmitt Dep. at pp. 41-43; Doc. 22 at ¶ 26). The court need not resolve this dispute as it is immaterial to its determination of the defendant's motion.

5

Administration."  (Tillery Dep. at pp. 44-45; Tillery Dep. at Ex. 3).  On the original resume Tillery provided to NHB in connection with her application for employment, in the section entitled "Education," it stated: "Jacksonville State University, Major Business Administration."  (Tillery Dep. at pp. 27, 44-46; Tillery Dep. at Ex. 1 and 2).

Tillery graduated from high school in 1966.  (Tillery Dep. at p. 23).  Tillery later attended Jacksonville State University in the 1970s but never obtained a college degree.  (Tillery Dep. at pp. 23, 92).  Tillery does not recall why she changed the wording of the "Education" section of her resume even though she had not taken any courses or done anything to further her pursuit of a college degree during the time between submission of the two resumes to the company.  (Tillery Dep. at pp. 51-52).

According to Schmitt, Crenshaw supported Tillery's promotion to Human Resources Manager in reliance upon the fact that she had a college degree and was concerned about Tillery's integrity because he had been led to believe that she had a college degree when she in fact did not.  (Schmitt Aff. at ¶ 7; Schmitt Dep. at pp. 32-34).  However, according to Tillery, she was promoted in October or November 2001, and she submitted the second resume after January 2002.  (Tillery Dep. at pp. 19, 44).

NHB also learned that Tillery had used her husband's stepfather's catering business to cater a training lunch and also cancelled a previously scheduled lunch through another caterer in favor of using her husband's stepfather's business.  (Schmitt Dep. at pp. 31-34).  One of Tillery's duties and responsibilities was to approve payment to caterers.  (Tillery Dep. at pp. 135-136).  The Company considered Tillery's actions in connection with the directing of catering business to her husband's stepfather as constituting a conflict of interest.  (Schmitt Dep. at pp. 31-34;

6

Schmitt Dep. at Ex. 2; Tillery Dep. at p. 117; Tillery Dep. at Ex. 4).

In late January 2003, NHB terminated Tillery's employment. In a letter following her termination, the company represented that it based its decision to terminate her on the alleged safety issues, the material misrepresentation on her resume, and what it perceived as a conflict of interest with the catering business. (Schmitt Dep. at pp. 31-34; Schmitt Dep. at Ex. 2). Schmitt testified that he was responsible for the decision to terminate Tillery's employment. The decision was made in conjunction with Flowers and the results of his investigation. The decision was presented to Crenshaw for his approval. (Schmitt Aff. at ¶¶ 9-12). Schmitt further testified that while Crenshaw ultimately supported the decision to terminate Tillery's employment, he never requested that Tillery's employment be terminated. (Schmitt Dep. at p. 86). To the contrary, Crenshaw wanted to issue Tillery a written reprimand rather than terminate her. (Schmitt Dep. at p. 86).

Tillery was unemployed from January 2003 to August 2004. (Tillery Dep. at p. 12). In August 2004, Tillery obtained subsequent employment as a Human Resources Manager for Sentinel, where her annual salary is $35,000.00. (Tillery Dep. at p. 8).

Tillery's predecessor as Human Resources Manager, Henry Polek, was receiving an annual salary of $55,000.00 at the time his employment with NHB ended. (Schmitt Dep. at p. 17). Polek was employed with NHB prior to MBCI's acquisition of the Company; consequently, his compensation had been established by the previous owners of NHB before the acquisition. (Schmitt Dep. at pp.17, 73; Schmitt Aff. at ¶ 3).

During her employment with NHB, Tillery had several discussions with Crenshaw about

7

her compensation.  (Tillery Dep. at pp. 62-63).  Tillery also contacted Linda Avant ("Avant"),

MBCI's Manager - Compensation, toward the latter part of 2002 to discuss how her salary

compared to that of other Human Resources Managers within the Company.  (Tillery Dep. at pp.

79-80:23; Schmitt Dep. at p. 76).  Tillery did not receive any information from Avant.  (Tillery

Dep. at pp. 79-80).  At the time Schmitt made the decision to terminate Tillery's employment, he

was unaware that Tillery had contacted Avant to discuss compensation.  (Schmitt Dep. at p. 76).

He was also unaware that Tillery had discussed her compensation with Crenshaw.  (Schmitt

Aff. at ¶ 13).  Tillery never raised any questions or expressed any concerns to Schmitt regarding

her compensation.  (*Id*.)

Upon Tillery's termination, NHB named Mic Barnett Interim Human Resources Manager

while it searched for a replacement for Tillery.  (Schmitt Dep. at p. 53).  Although NHB

considered Barnett and several external candidates, NHB ultimately hired Dennis Kirkland to

replace Tillery as Human Resources Manager.  (Schmitt Dep. at p. 56).  Kirkland had Human

Resources experience with other companies, had grown his strengths through experience with

them, and had a proven track record of making tough decisions and standing up to human

resources challenges.  (Schmitt Dep. at p. 56).  NHB offered Kirkland an initial annual salary of

$68,000.00.  (Schmitt Aff. at ¶ 16).  The annual salary was based on his qualifications and what

NHB believed it would require to convince Kirkland to leave his current employer, which did

not want to lose him.  (Schmitt Dep. at pp. 56-57; Schmitt Aff. at ¶16).  At the time NHB offered

Kirkland employment, he was earning a base salary of approximately $60,000.00.  (Schmitt

Aff. at ¶ 16).  Kirkland's salary fell within the same salary band as Tillery's for purposes of the Company's compensation structure.  (Schmitt Dep. at p. 85).

After Kirkland began working for NHB, his former employer made him an offer to return to the company.  (Schmitt Dep. at pp. 58-59; Schmitt Aff. at ¶ 17).  Because NHB was pleased with Kirkland's performance, it made a business decision to raise Kirkland's annual salary to approximately $85,000.00 in order to retain his employment.  (*Id*.)  NHB contends that Kirkland's pay raise was determined by market forces, namely what another employer was willing to compensate Kirkland for his services.  (*Id*.).

### Conversations Regarding Tillery's Pay

Tillery states that she had the following conversations with NHB management about her pay: when she was offered the HR manager position and she asked Crenshaw how her salary compared to that of other HR managers within the company; when a male buyer was hired making $12,000.00 more per year than she made; when she learned two female supervisors were making less than other plant supervisors; when an employee was being promoted to Regional Training Manager and making more money than she; and, when she called Linda Avant, compensation manager for Masterbrand, and asked her how she compared to other HR managers in the corporation.  (Tillery Dep. at pp. 62-80).

### MOTION TO STRIKE PORTIONS OF SCHMITT'S AFFIDAVIT

### Generally

The plaintiff asks the court to strike portions of Schmitt's affidavit which was offered by the defendant in support of its motion for summary judgment.  Rule 56(e) of the FEDERAL RULES OF CIVIL PROCEDURE states, in pertinent part, that affidavits in support of or in opposition to a

motion for summary judgment ". . . shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). If a supporting or opposing affidavit fails to conform to Rule 56(e), the opposing party may move to strike the nonconforming portion or portions. *Ali v. City of Clearwater*, 915 F. Supp. 1231, 1236 (M.D. Fla. 1996), citing *Interfase Marketing, Inc. v. Pioneer Technologies Group, Inc*., 1993 WL 229601, *2 (M.D. Fla. June 23, 1993), *Barnebey v. E.F. Hutton & Co*., 715 F. Supp. 1512, 1529 (M.D. Fla. 1989)).

The plaintiff asserts in her motion to strike that portions of the affidavit are due to be struck because (1) they are without foundation, (2) they are not based on personal knowledge, (3) they contradict earlier testimony given by Schmitt at his deposition, and (4) they are inadmissible hearsay.

### Discussion Regarding the Purportedly Objectionable Portions

The first sentence at issue provides "The General Manager also believed Tillery was appropriately credentialed for the position in that she had a college degree." (Doc. 21 at ¶ 1, quoting Schmitt Aff. at ¶ 7). The plaintiff argues that this sentence is due to be struck because "there is no evidence supporting what Fred Crenshaw 'believed' and there is no foundation for same. In fact, the only way affiant could know what someone else believed would be to testify that said individual told him his belief and that would be rank hearsay." (Doc. 21 at ¶ 1). The Eleventh Circuit Court of Appeals recently stated that "[t]he Rules are clear: 'Supporting and opposing affidavits *shall* be made on personal knowledge.' FED. R. CIV. P. 56(e)." *Pace v. Capobianco*, 283 F.3d 1275, 1278-1279 (11ᵗʰ Cir. 2002) (emphasis in original). To the extent

that Schmitt's statement purports to provide the reader with the mental operation of Crenshaw, it is due to be struck.[6]

The next sentences at issue provide "When Tillery was made Human Resources Manager, her compensation was determined with her starting salary with the company in mind. It was also based on her skills and experience." (Doc. 21 at ¶ 2, quoting Schmitt Aff. at ¶ 8). The plaintiff argues that these two sentences are due to be struck because they contradict Schmitt's earlier deposition testimony wherein he testified that Tillery's salary was "set by the hiring manager in conjunction with the compensation manager." (Doc, 31 at ¶ 2). The court disagrees. Schmitt is the Vice President of Field Human Resources for MBCI and was so prior to the time that Tillery became HR Manager. Schmitt's testimony that Tillery's salary was set by the hiring manager does not contradict what criteria the hiring manager used to set the salary. The court finds that the complained-of portion of Schmitt's affidavit is information that he could well be aware of in his capacity as Vice President of Field Human Resources, and is, therefore, not due to be struck.

The next complained-of portion provides, "In January 2003, NHB decided to terminate Tillery's employment. I was responsible for making that decision." (Doc. 21 at ¶ 3, quoting Schmitt Aff. at ¶ 9). The plaintiff argues that the second sentence of paragraph nine is due to be struck because it is "without explanation and is a sham," and because it contradicts Schmitt's

---

[6] The court does not agree with plaintiff's additional assertion that any statement by Crenshaw would be hearsay. That would only be the case if his statement were offered for the truth of the same. *See* FED. R. EVID. 801(c). To the extent it is offered to show that the concern precipitated a followup investigation, it might well be admissible. *See* Schmitt Dep. at p. 88.

To the extent that the defendant asserts that this statement is merely an elaboration of what Schmitt said in his deposition (particularly page 68), the court is not impressed as there is no reference to a college degree there. It appears the defendant was making reference to page 88 of the deposition where Schmitt was talking about the investigation that was conducted. (Schmitt Dep. at p. 88). However, the portion of that testimony dealing with what Crenshaw thought would be inadmissible because Schmitt clearly states that his testimony, in part, is premised on what he "suspect[ed]" Crenshaw did. (*Id.*).

earlier testimony that he made the decision to terminate Tillery along with Crenshaw.  (Doc. 21 at ¶ 3).  The court disagrees.  Schmitt's deposition testimony related that he "pushed" the decision to terminate Tillery on Crenshaw.  While Crenshaw ultimately agreed with Schmitt's decision, Schmitt's testimony is that he was the impetus for the decision.  (*See* Schmitt Dep. at pp. 27, 86).  That testimony is not inconsistent with the complained-of portion of the affidavit when read in context.  As such, the court finds that the second sentence of paragraph nine is not due to be struck.

The last complained-of portion reads:

> Flowers had conducted an investigation into Tillery's educational background and the conflict of interest situation.  Flowers' investigation revealed that Tillery did not have a college degree as she had represented in her resume and that she had in fact engaged in a conflict of interest when she had approved the use of her husband's stepfather's catering business despite the General Manager's direction to refrain from using this catering business until the matter could be addressed with corporate.

(Doc. 21 at ¶ 4 (quoting Schmitt Aff. at ¶ 11)).  The plaintiff argues that the foregoing paragraph is unsupported by the evidence.  (Doc. 21 at ¶ 4).  The defendant retorts that paragraph eleven related to its investigation and conclusions regarding Tillery's resume falsification and conflict of interest.  (Doc. 24 at ¶ 4).  The court concurs.  Although Tillery does not agree with the company's conclusions, they are just that.  Schmitt testified in a similar fashion in his deposition.  Schmitt was involved in the investigative process and, therefore, was privy to its results.

Therefore, paragraph eleven of Schmitt's affidavit is not due to be struck.

## SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see Fed. R. Civ. P.* 56(a) and (b). Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d

202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at

249.

## DISCUSSION

### Disparate Treatment

The plaintiff alleges that she was subjected to disparate treatment because she was paid

less than similarly situated male managers. (Doc. 1 at ¶ 8). As is the situation in most disparate

treatment cases, the primary issue is whether the defendant intentionally discriminated against

the employee because of her gender or on some other improper consideration. *See U.S. Postal*

*Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983).

Discriminatory intent can be established through either direct or circumstantial evidence. *See*

*Aikens*, 460 U.S. at 714 n.3. The appropriate framework from which to evaluate the plaintiff's

claim when circumstantial evidence is involved is under the familiar burden shifting framework

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d

668 (1973), and *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L.

Ed. 2d 207 (1981).[7] Under this framework, the Title VII plaintiff has the initial burden of

establishing a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802.

In *Meeks v. Computer Associates Intern.,* 15 F.3d at 1013, 1019 (11th Cir. 1994), the

Eleventh Circuit Court of Appeals stated:

> Under the *McDonnell Douglas/Burdine* approach, a female Title VII
> plaintiff establishes a prima facie case of sex discrimination by showing that she
> occupies a job similar to that of higher paid males. *Miranda*, 975 F.2d at 1529.
> Once a prima facie case is established, the defendant must articulate a "legitimate,

---

[7] The plaintiff does not assert that there is any direct evidence of discrimination in this case.

> non-discriminatory reason for the pay disparity." *Id.* (citing *Burdine*, 450 U.S. at 255-56, 101 S. Ct. at 1095). This burden is "exceedingly light"; the defendant must merely proffer non-gender based reasons, not prove them. *Id.* (quoting *Perryman v. Johnson Prod., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983)). Once such a justification is advanced, the plaintiff must demonstrate by a preponderance of the evidence that the employer had a discriminatory intent. In other words, the plaintiff must show that "a discriminatory reason more likely than not motivated [the employer] to pay her less." *Id.* (citing *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095). . . .

The court also stated that if "the evidence is in equipoise on the issue of whether a salary differential is based on a 'factor other than sex,'" the employer prevails on the Title VII claim. *Meeks*, 15 F.3d at 1019.

The defendant argues that the plaintiff cannot establish a *prima facie* case of gender discrimination and that, even if she could, it has set forth legitimate, nondiscriminatory standards for determining her compensation, and there is no evidence those standards were pretext for unlawful discrimination. (Doc. 18 at pp. 14-15).

### The *prima facie* case

To prevail on her Title VII claim, the plaintiff must first establish a *prima facie* case, as set forth previously. In the context of wage discrimination claims, the Eleventh Circuit has recently articulated that the plaintiff must establish the following elements to prove a *prima facie* case: (1) she belongs to a protected group; (2) she received low wages; (3) similarly situated comparators outside the protected group received higher compensation; and (4) that she was qualified to receive higher wages. *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004). The parties do not dispute that Tillery belongs to a protected group; however, they do dispute the

remaining elements.[8]

The plaintiff first asserts that she was paid less than both her predecessor and her successor in the Human Resources Manager position. (Doc. 22 at p. 12).[9] Therefore, she argues that because she is a female that was paid less than similarly situated males, she has established a *prima facie* case of gender discrimination. The defendant argues, however, that the pay differentials were justified and, thus, Tillery cannot establish a *prima facie* case. (Doc. 18 at pp. 16-18). However, the court finds that the defendant's alleged justifications are appropriate for establishing a legitimate gender-neutral basis for its decision and have no bearing on the plaintiff's *prima facie* case. For summary judgment purposes, the court will assume that Tillery has established a *prima facie* case: she is a female that was paid less than Polek or Kirkland for the same job and was arguably at least minimally qualified to receive higher wages.

### MBCI's legitimate, non-discriminatory reasons for the pay differential

The next issue is whether the defendant has adequately articulated its legitimate, nondiscriminatory reason or reasons for the pay differential. The plaintiff contends that the defendant has not adequately articulated its reason or reasons. In *Chapman v. AI Transport*, 229

---

[8]At the outset, the court notes that Tillery named the following comparators: J.W. Coady (Production Manager); James Hayes (Buyer); Mike Hatten (Production Superintendent); Darcey Johnson (Materials Manager); Wolfgang Veitengruber (Engineering); Ken Smith (Quality Manager); Alan Britt (Maintenance Manager); Tim Heath (Cost Accounting Manager); and Lee York (Production Manager). (See Doc. 1 at ¶ 8; Tillery Dep. at pp. 89, 97, 101-105). The defendant argues that Tillery's alleged comparators occupied roles separate and distinct from Tillery's and, thus, were not comparators at all. (Doc. 18 at pp. 16-19). The court agrees. The only mention the plaintiff makes of these comparators in her brief is found in her statement of facts, wherein she asserts that "she was paid less than J.W. Coady, James Hayes, Dennis Kirkland, Dercay Johnson, Alan Brett, and Mike Hatton, who were other non-degreed managers with similar duties and responsibilities." (Doc. 22 at ¶ 82). There is no further allegation that Tillery performed functions and duties akin to those performed by the aforementioned individuals, and, in fact, the only similarity Tillery can conjure up between herself and the other "non-degreed managers" is that they all had "manager" in their job title. As such, for summary judgment purposes, the court will only consider Polek and Kirkland comparators for Title VII gender discrimination purposes.

[9]The plaintiff actually says that her "predecessor, a male, was paid $85,000.00 per year for the same job." However, it was actually her successor that was paid $85,000.00 per year for the Human Resources Manager position. (See Schmitt Dep. at pp. 58-59).

F.3d 1013, 1034 (11th Cir. 2000) (en banc), the Eleventh Circuit stated that "'the defendant's

explanation of its legitimate reasons must be clear and reasonably specific' so that 'the plaintiff

[will] be afforded a full and fair opportunity to demonstrate pretext.' *Burdine*, 450 U.S. at 258,

101 S. Ct. at 1096 (quotation omitted)." The court further stated, "A subjective reason is a

legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and

reasonably specific factual basis upon which it based its subjective opinion." (*Id.*). The court

further provided an example:

> Continuing our example of a sales clerk or wait staff position, it might not be
> sufficient for a defendant employer to say it did not hire the plaintiff applicant
> simply because "I did not like his appearance" with no further explanation.
> However, if the defendant employer said, "I did not like his appearance because
> his hair was uncombed and he had dandruff all over his shoulders," or "because
> he had his nose pierced," or "because his fingernails were dirty," or "because he
> came to the interview wearing short pants and a T-shirt," the defendant would
> have articulated a "clear and reasonably specific" basis for its subjective
> opinion--the applicant's bad (in the employer's view) appearance. That
> subjective reason would therefore be a legally sufficient, legitimate,
> nondiscriminatory reason for not hiring the plaintiff applicant. The burden would
> then shift back to the plaintiff to offer sufficient evidence for a reasonable
> factfinder to find that the defendant's reason was pretext for discrimination.

*Chapman*, 229 F.3d at 1034 (footnote omitted).

MBCI asserts the following as its legitimate, nondiscriminatory reasons for its decision

to pay Tillery less than Polek and Kirkland:

> . . . . NHB hired Tillery into a clerical position of Assistant to the Human
> Resources Manager. [ ] Tillery was paid $12 per hour plus overtime, which
> totaled approximately $25,000 per year, and was not eligible for bonuses. [ ]
>
> When Tillery was made Human Resources Manager, her compensation
> was determined with her starting salary with the Company in mind. [ ] It was also
> based on her skills and experience. [ ] NHB had reservations about Tillery's
> ability to perform the Human Resources Manager job and, therefore elected not to
> give her a tremendous salary until she proved her ability to do the job. [ ] It
> nonetheless gave her substantial salary increases that exceeded both the raises it

17

typically gave employees promoted internally and the overall salary Tillery had earned in previous human resources jobs. . . . the Company paid Tillery what it thought it needed to obtain her services. [ ]

(Doc. 18 at pp. 18-19 (citations omitted)).  Additionally, the defendant justifies Polek and

Kirkland's higher salaries as follows:

As for Tillery's predecessor as Human Resources Manager, Polek, and her successor, Dennis Kirkland, NHB concedes they were paid more than Tillery. However, the difference in compensation was for legitimate, nondiscriminatory reasons that had nothing to do with their gender.  Polek's salary at the time of Tillery's hire was $55,000. [ ] However, Polek was an NHB employee at the time MBCI acquired NHB so his salary had been set by the owners of NHB before the acquisition. [ ] Additionally, Polek had a number of years service with the Company at the time he was released.  The manner in which salaries were set before MBCI's acquisition of NHB cannot be held against the Company with respect to decisions made after the acquisition.  Upon Polek's termination, MBCI was given its first opportunity to set the salary for the Human Resources Manager position at the plant at which Tillery worked, and the basis for that decision is discussed below.

NHB hired Kirkland to replace Tillery as Human Resources Manager. [ ] Kirkland has a college degree. [ ]  He had Human Resources experience with other companies, had grown his accountabilities through experience with them, and had a proven track record of making tough decisions and standing up to human resources challenges. [ ]  In addition, Kirkland was earning an annual salary of $60,000 in his former position and was eligible for significant bonus compensation. [ ] Therefore, based on the amount it believed was fair in light of his qualifications and what it would take to lure Kirkland from his employer at the time, which did not want to lose him, NHB offered Kirkland an initial salary of $68,000. [ ] Although higher, Kirkland's salary fell within the same salary band as Tillery for purposes of the Company's compensation structure. [ ] Critically, Kirkland was an external hire as opposed to Tillery, who was promoted internally. Therefore, as discussed below, NHB based her salary increases, in part, on her beginning salary with the Company.  In point of fact, however, NHB gave Tillery significantly greater pay increases than it typically gives employees promoted internally.  Tillery's attempted comparison to Kirkland is not appropriate based on the differing circumstances through which they became Human Resources Manager.  It is an undisputed fact that Tillery accepted a $12.00 an hour clerical position with NHB with no expectation or assurance that she would have the opportunity to be promoted to the Human Resources Manager position.  Kirkland on the other hand, was not going to accept a decrease in pay to go to work for NHB.

18

(Doc. 18 at pp. 17-18 (citations omitted)).  The plaintiff asserts this reasoning is merely pretext for the true reason for the differential, that she is a female, and that the defendant's "market force defense" is not a "legitimate factor other than sex."  (Doc. 22 at p. 11 (citing *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518 (11th Cir. 1992))).  The court disagrees.

The Eleventh Circuit has rejected "market forces" defenses in cases where the defendant relies solely on prior salaries to determine disparate wage rates.  *See Glenn v. General Motors Corp.* 841 F.2d 1567 (11th Cir. 1988).  Although employers may not consider prior salaries alone, they may act on the basis of shift differentials or differences in experience, training, or ability, among other things.  *Glenn*, 841 F.2d at 1571.  The defendant's argument that the difference in pay is due to Kirkland and Polek's prior salaries and their experience and length of time with the company, respectively, is appropriate because it is not simply based on prior salary.

The pertinent inquiry now is whether the plaintiff has adequately challenged the defendant's proffered reasons for the differentiation in pay to overcome the defendant's motion for summary judgment.  In *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998), the court stated:

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one.  The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994) (citation omitted).  The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Sheridan,* 100 F.3d at 1072 (citation and internal quotation marks omitted); *see also Walker,* 53 F.3d at 1564 (Johnson, J., concurring) (discussing methods of proving pretext).

> However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action. At that point, judgment as a matter of law is unavailable.

The court finds that the plaintiff has failed to offer "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find the [defendant's reason] unworthy of credence." *Id*.

In the present case, the evidence shows that the plaintiff earned $41,600.00 per year as Human Resources Manager. While this was less than both Polek and Kirkland earned, the defendant's reasons for the pay differential are worthy of credence. When Polek was terminated, he was earning $55,000.00. At that time, Polek had been with NHB "since they opened the doors." (Tillery Dep. at p. 88). When NHB hired Kirkland, they hired him at $68,000.00 per year. NHB specifically sought out Kirkland for his experience and track record as a Human Resources Manager. Kirkland was gainfully employed with another company at that time. Therefore, in order to lure him to NHB, the company had to offer him a salary in excess of what he was currently earning.

The defendant also notes that the plaintiff's most appropriate comparator is Mic Barnett, who served as Interim Human Resources Manager between Tillery and Kirkland.[10] When Barnett was asked to step in as Interim Human Resources Manager he was earning $43,000.00. (Doc. 23 at p. 7). As such, the defendant argues, the only person Tillery was similarly situated to

---

[10] The plaintiff did not name Barnett as a comparator.

20

was Barnett, and he had many more years with the company than she did.  (Doc. 23 at p. 8).

The plaintiff has failed to offer any evidence that would call the defendant's proffered, legitimate reasons for its decisions regarding the plaintiff's pay into question.  There is no requirement under Title VII that every employee in a certain position be paid the same amount and pay disparities based on experience, seniority, and qualifications are permissible.  As such, the court finds that the defendant's motion for summary judgment as it pertains to the plaintiff's wage discrimination claim is due to be granted.

## Retaliation Claim

The defendant argues that the plaintiff's retaliation claim is insufficient because she cannot show that she engaged in any statutorily protected activity and that, even if she could, there is no causal link between her expressions and her termination.  (Doc. 18 at pp. 20-22).  Lastly, the defendant contends that the plaintiff cannot rebut the legitimate, nondiscriminatory reasons that were articulated for her termination.  (Doc. 18 at pp. 23-25).

### *Prima Facie* Case

To state a prima facie case of retaliation, the plaintiff must show "(1) [that she] engaged in statutorily protected activity; (2) that an adverse employment action occurred; and (3) that the adverse action was causally related to the plaintiff's protected activities."  *Coutu v. Martin County Board of Co. Commission*, 47 F.3d 1068, 1074 (11th Cir. 1995).  The parties do not dispute that Tillery suffered an adverse employment action; they do, however, dispute whether Tillery engaged in any statutorily protected activity and if she did, whether her termination was causally related to that protected activity.  The defendant first asserts that Tillery has failed to show that she engaged in any statutorily protected activity.

**Protected Conduct**

The only possible protected conduct alleged by the plaintiff concerns the following: (1) her conversation with Crenshaw when she was offered the Human Resources Manager position regarding when she would get another pay increase, how she compared with other HR managers working for NHB, and how the bonus system worked; (2) her conversation with Crenshaw when a male buyer was hired making more than her; (3) her conversation with Crenshaw during a review of two female supervisors at the plant that made less than male supervisors; (4) her conversation with Crenshaw when Nick Barnett[11] was being made Regional Training Manager and the plaintiff was upset because he was going to be making more than she and Crenshaw told her that he would "get that corrected;" and (5) her conversation with Linda Avant regarding how she compared with other HR managers in the corporation.  (Tillery Dep. at pp. 55-83).

Title VII extends protection to not only those "who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employers' internal grievance procedures."  *Rollins v. State of Florida Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).  It is evident that the term "protected activity" is to be construed broadly.  Although the court finds it a stretch to classify Tillery's discussions with Crenshaw and her one telephone call to Avant asking how she compared to other Human Resources Managers within the company as "complaints," for summary judgment purposes only, it will do so.

---

[11]Barnett's first name varies throughout the court's record.  In some instances, he is referred to as "Nick" and in others as "Mic."

**Causal Connection**

The defendant next asserts that the plaintiff has failed to establish the necessary causal link between any protected conduct and her termination.  In order to establish the requisite causal relation, the plaintiff "need only show 'that the protected activity and the adverse action are not completely unrelated.'"  *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).  The defendant argues that the plaintiff cannot prove causal connection because she cannot show that the ultimate decision maker was aware of the her complaints.   It is well-established that "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence."  *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (citing *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993)).  In *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997), the court stated:

> Since corporate defendants act only through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action.  *See Goldsmith*, 996 F.2d at 1162 (general agency principles govern the circumstances in which a principal will be held liable for the acts of its agents under Title VII).

Schmitt states in his affidavit that:

> At no time leading up to the termination of Tillery's employment did Crenshaw mention to me anything concerning Tillery's compensation.  He never advised me that she had complained to him about her compensation nor did he ever indicate any displeasure or discontent with her job performance that was in any way related to issues pertaining to her compensation.  Tillery's compensation was never an issue and was never discussed between myself, Flowers and/or Crenshaw.

(Schmitt Aff. at ¶ 13).  Even assuming for the sake of discussion that the plaintiff's conduct

23

constituted protected activity, the court finds that Schmitt was not aware at the time he recommended terminating the plaintiff of those activities. Although the plaintiff seems to dispute whether Schmitt was the decisionmaker, based upon the evidence before it, the court finds that he was.

In his affidavit, Schmitt testified that he was the impetus for Tillery's termination. Although Crenshaw was the person who communicated Tillery's termination to her, Crenshaw did so based on the recommendation of Schmitt and Flowers. There is no evidence before the court that Crenshaw's role extended beyond that. As such, the plaintiff cannot show that her termination was causally connected to her complaints or to her discussion with Crenshaw or Avant regarding her compensation. Because the plaintiff has failed to establish a *prima facie* case of retaliation, the defendant's motion is due to be granted on that claim as well.

### Legitimate, nondiscriminatory reasons for termination

But for the court's finding that he plaintiff has not established a *prima facie* case, the next step would have been to determine whether MBCI proffered legitimate, nondiscriminatory reasons for her termination. As with the first claim, once the defendant has articulated its legitimate, non-discriminatory reasons, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538. Again, this must include an evaluation of "whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of

credence." *Combs*, 106 F.3d at 1538.  If it is "determine[d] that a reasonable jury could conclude that the employer's articulated reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action." *Id.*

In evaluating whether the plaintiff has demonstrated pretext, the court must examine each of the proffered "legitimate reasons" for the termination and determine whether the plaintiff has cast sufficient doubt on each to permit a reasonable factfinder to conclude that the purported "legitimate reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538-39. *See Mora v. University of Miami*, 15 F. Supp. 2d 1324, 1336 (S.D. Fla. 1998) (A plaintiff, nevertheless, can survive summary judgment by presenting evidence demonstrating a genuine issue of material fact as to the truth or falsity of each of the employers' legitimate, nondiscriminatory reasons), *citing Evans v. McClain of Georgia, Inc*., 131 F.3d 964-65 (11th Cir. 1997)(citing *Combs*, 106 F.3d at 1530-32)).

The defendant premises its termination of the plaintiff on four purportedly legitimate reasons: (1) her violation of the safety rules; (2) employee complaints regarding Tillery; (3) the misrepresentation on her resume regarding her education; and (4) the conflict of interest with her husband's stepfather's catering business.  As to the first ground, Tillery has sufficiently called into question the defendant's rationale concerning her violation of the safety rules.  Although the plaintiff does not deny that she went into the plant without wearing safety shoes, she contends that no safety rule was in place a the time that she did.  Taking the evidence in the light most favorable to the plaintiff, the court would have found that the defendant's first proffered reason

would not have been sufficient grounds for the plaintiff's termination in the absence of an established policy.

However, the same is not true concerning the second proffered reason - - employee complaints regarding Tillery.  Schmitt testified that employees complained that when they would go into Tillery's office she "screamed and hollered" at them and that MBCI received complaints about Tillery on its employee hotline.  The plaintiff concedes that MBCI received the complaints but points out that Schmitt could not recall how many complaints they received and that she was never reprimanded.  Such an explanation would not have been sufficient to call the defendant's legitimate reason into question.

Next, the defendant maintains that it lost confidence in Tillery's integrity because her resume reflected that she had a B.S. in Business Administration when, in actuality, she never graduated from college.  (Doc. 18 at pp. 22-23).  Tillery retorts that this reason is pretext because she became HR Manager before she supplied Crenshaw with her updated resume.  Again, the court finds that this reason would have been insufficient to overcome the defendant's proffered reason.  Even if Crenshaw did not rely on her second resume in promoting Tillery, the misrepresentation is sufficient to undermine her integrity with the company.

Lastly, MBCI asserts that Tillery engaged in a conflict of interest when she used her husband's stepfather's catering business to cater a training lunch and canceled a previously scheduled caterer in favor of using her husband's stepfather's business.  (Doc, 18 at p. 23).  Tillery disputes MBCI's rendition of the facts surrounding this proffered reason for her termination.  She also notes that the payments to the caterer were approved by another manager.  Because the court has already found that summary judgment is due to be granted, it need not

26

resolve whether Tillery has established that the defendant's final proffered reason for her termination is pretext for discrimination.

## CONCLUSION

For the reasons stated above, the plaintiff's motion to strike is due to be granted in part and denied in part and the defendant's motion for summary judgment is due to be granted.  An appropriate order will be entered contemporaneously herewith.

**DONE,** this the 30th day of June, 2005.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge